1  Andrew M. Hutchison  (SBN 289315)
    ahutchison@cozen.com
2  COZEN O'CONNOR
   101 Montgomery Street., Suite 1400
3  San Francisco, CA 94104
   Tel: (415) 644-0914
4  Fax: (415) 644-0978

5  Attorneys for Plaintiff
   Estate of Joseph H. Daher, by and through
6  its Personal Representative, Christine
   Daher.

7

8              UNITED STATES DISTRICT COURT
9              CENTRAL DISTRICT OF CALIFORNIA

10  ESTATE OF JOSEPH H. DAHER, by        | Case No.:
    and through its personal representative,
11  Christine Daher,                      | COMPLAINT FOR:

12              Plaintiff,                 | RECOVERY OF INSURANCE
                                           | PROCEEDS DUE TO LACK OF
13         vs.                             | INSURABLE INTEREST

14  LSH CO, AND WELLS FARGO BANK,         | UNJUST ENRICHMENT
    N.A., as Securities Intermediary,
15                                         |
                Defendants.               | DEMAND FOR JURY TRIAL
16

17

18

19

20

21

22

23

24

25

26

27

28

                        **COMPLAINT**

Plaintiff the Estate of Joseph H. Daher, by and through its Personal Representative, Christine Daher (the "Estate") avers on knowledge as to itself and its own acts, and on information and belief as to all other matters, as follows:

## COMPLAINT

1.    Plaintiff, the Estate of Joseph H. Daher, by and through its Personal Representative, Christine Daher (the "Estate"), for its Complaint pursuant to 18 *Del. C.* § 2704(b) and Delaware law, against Defendant LSH CO ("LSH") and Defendant Wells Fargo Bank, N.A., as Securities Intermediary ("Wells Fargo"), alleges as follows.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff, a citizen of California, and Defendant LSH, a citizen of a foreign state, and Wells Fargo, a citizen of the state of South Dakota, and because the amount in controversy exceeds $75,000.  The Estate bases its allegations on personal knowledge as to its own acts and on information and belief as to all other matters.

## NATURE OF THE ACTION

2.    Through this Complaint, the Estate seeks to recover the death benefit paid out under an illegal insurance policy that was nothing more than a human-life wager fraudulently created by investors for investors on the life of Mr. Daher.  The current investor-owner, LSH, is an investment fund, which is a subsidiary of multi-national investor: the Alberta Investment Management Corporation ("AIMCo").   AIMCo, through LSH, has acquired over three billion dollars in life insurance policies in a deliberate undertaking to perpetuate illegal wagers on the lives of senior citizens across the United States and to profit from their deaths.

3.    The improper use of life insurance to speculate and wager on the lives of others is nothing new.  "Since the initial creation of life insurance during the sixteenth century, speculators have sought to use insurance to wager on the lives of strangers." *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059, 1069 (Del. 2011)

("*Price Dawe*").  Insurance policies which are procured as a wager on the life of the person insured not only violate Delaware public policy and its constitutional prohibition on wagering, but they also violate the state's insurable interest requirement, which precludes investors from manufacturing life insurance policies for the purpose of resale. *Id*.

4.     Although human life speculators have been present for hundreds of years, never has the problem been more wide-spread or involved such vast amounts of money than in recent years.  In the early 2000s, institutional investors began pooling large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were effectively securitized and sold to other investors.  *Id.*

5.     It is well established, however, that in the early 2000s, there was not a sufficient supply of existing life insurance policies to satisfy investor demand.   In particular, investors were interested in high face amount policies insuring the lives of senior citizens, but there were only "a limited number of seniors who had unwanted policies of sufficiently high value."  *Price Dawe*, 28 A.3d at 1070.

6.     "As a result, STOLI promoters sought to solve the supply side shortage by generating new, high value policies."  *Id*.  These policies are often referred to as STOLI—or stranger originated life insurance.  *Id.*

7.     The most common way STOLI promoters sought to solve this supply shortage (i.e., the dearth of pre-existing, legitimately procured policies available for purchase on the secondary market) was to ***manufacture*** policies for investors through the use of sham premium financing programs.  [*See, e.g.,* Timeline, Preston Ventures, attached hereto as **Exhibit A**), at 38 (available at https://prestonv.com/timelines) (life settlements historical timeline, referring to 2005: "Premium finance becomes a dominate origination tool for agents as investment from hedge funds and investment banks increased demand for product outstrips $2B 'Natural' Supply.  ***Manufactured***

*policies* spike availability to over $10B Annually."   (all caps removed) (emphasis added)].[1]

8.   One of the most prolific STOLI promoters of the 2000's—and the one that notoriously used sham trusts and sham 'premium financing" to manufacture STOLI policies for investors—was a family of Delaware companies known as "Coventry."

9.   Entities such as Coventry—sometimes referred to in the STOLI industry as "funders"—worked with a nationwide network of insurance producers, who, acting as the funders' agents, assisted the funders by, among other things, identifying senior citizens meeting the funders' investment criteria and influencing those seniors to become involved in the STOLI transactions the funders were orchestrating.

10.   The STOLI transactions orchestrated by funders like Coventry and its agents were presented to hand-selected senior citizens in rosy terms that camouflaged the transactions' impropriety as being a "risk-free" opportunity, "just a good deal," or as being similar to "hitting the lottery" or acquiring a winning "bingo" card.

11.   The specific mechanisms by which each funder's STOLI program operated could and often did vary in one respect or another.  But each shared basic similarities including that the policies at issue were procured by third parties that lacked an insurable interest in the insureds and that sought to wager on the life of the insureds.

12.   In Delaware and other places, not only do these STOLI policies violate public policy and constitutional bans on wagering and insurable interest laws, but they take advantage of senior citizens and otherwise convert a legitimate life insurance product into an illegitimate cash machine whereby a stranger to the insured is more interested in seeing the insured dead than alive.

13.   The Policy at issue in this case was a $5 million life insurance policy, issued by American General Life Insurance Company ("American General"), policy Number UM0023726L, on the life of Joseph Daher (the "Policy") in or around 2006.

---

[1] Preston Ventures is LSH's current advisor.

4

**COMPLAINT**

The Policy was not procured by Mr. Daher nor was it intended for his (or his family's) benefit.

14.     Instead, Coventry funded, procured, and controlled the Policy from inception through a systematic nationwide program that used sham Delaware statutory trusts to feign compliance with insurable interest laws so that Coventry could procure a massive portfolio of multi-million dollar life insurance policies on senior citizens meeting its investment criteria for the benefit of itself and other investors. Although Coventry procured this Policy, Coventry did not have an insurable interest in Mr. Daher's life.

15.     In 2012, AIMCo, through LSH, knowingly purchased the Policy, as part of a portfolio of policies that had been predominantly originated through non-recourse premium finance loans. AIMCo, through LSH, knew the Policy had been issued through Coventry's notorious sham non-recourse premium financing program and knew or should have known the Policy had been issued without insurable interest.

16.     After Mr. Daher passed away, AIMCo, through LSH, made a claim for the Policy's death benefit, which American General elected to pay in the amount of at least $5 million. Under Delaware law, because the Policy was procured at inception by strangers to Mr. Daher who lacked insurable interest on his life, the death benefit must be awarded to the Estate. Indeed, Delaware law recognizes that the only way to stop STOLI policies from being created and human-life wagers from being perpetuated in violation of Delaware's Constitution and longstanding public policy is to strip investors of the fruits of the illegal wager if and when such a STOLI policy is exposed and successfully challenged in court. This right of recovery is set forth as an explicit statutory cause of action in Delaware's insurable interest statute: 18 *Del. C.* § 2704(b).

## PARTIES

17.     Plaintiff, the Estate, was established in Los Angeles County, California following Mr. Daher's death. Mr. Daher was a resident of California and was, at all times relevant to this Complaint, a citizen of the State of California. Mr. Daher's

daughter, Christine Daher, is the nominated executor under Mr. Daher's Will and has been appointed the Personal Representative of the Estate as Executor.  Christine Daher is a citizen of the State of California; the Estate is a citizen of the State of California.

18.    Defendant LSH CO is a public limited liability company ("société anonyme de titrisation") incorporated and existing under the laws of the Grand-Duchy of Luxembourg with its principal place of business in Luxembourg and is a citizen of a foreign state.

19.    Wells Fargo is a national banking association with its main office in Sioux Falls, South Dakota.  Wells Fargo is being named solely in its capacity as Securities Intermediary.  Wells Fargo is a citizen of the state of South Dakota.

## JURISDICTION AND VENUE

20.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff, a citizen of California, and Defendants, a citizen of a foreign state (LSH) and the state of South Dakota (Wells Fargo) respectively, and because the amount in controversy exceeds $75,000.

21.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in the Central District of California.

## FACTS COMMON TO ALL CLAIMS

### Coventry Creates Massive Secondary Market Demand for High-Face-Value Life Insurance Policies on Unrelated Senior Citizens

22.    Coventry is a family of entities that claims to be the "leader and creator" of the life settlement industry and the secondary market for life insurance.[2]  *See* Reuters,

---

[2] The family of Coventry entities includes but is not limited to Coventry First, LLC, Coventry Financial, LLC, Coventry Capital, LLC, and PFP Funding I LLC. *See* PR Newswire, Coventry Continues as #1 in Life Settlement Industry, June 13, 2018 (available at https://www.prnewswire.com/news-releases/coventry-continues-as-1-in-life-settlement-industry-300665692.html) (last accessed April 8, 2021).  Unless otherwise indicated, these entities will be referred to herein as "Coventry."  The Coventry family of companies are owned and managed by Alan Buerger, his wife Constance Buerger, their son Reid Buerger, and Reid's wife Krista Buerger (formerly Krista Lake) (collectively, the "Buerger Family").  [*See, e.g.*, Trial Tr. Nov. 12, 2013,

6

**COMPLAINT**

*AIG, Coventry First settle lawsuit over 'life settlements,'* Feb. 29, 2016 (available at https://www.reuters.com/article/us-aig-trial-coventryfirst-idUSKCN0W22GE)   (last accessed April 8, 2021); Coventry's website, *Our History* (available at https://coventry.com/about-coventry/our-history) (last accessed April 8, 2021).

23.   In the 2000's, Coventry's role in the secondary market included serving as a policy funder, originator, and servicer for institutional investors buying large quantities of policies.  As an originator, Coventry would "find" and bring the kinds of policies investors were seeking to those investors, who in turn compensated Coventry, including through hefty origination fees.

24.   For example, Coventry and its investor Lavastone[3] entered into a series of Life Policies Origination Agreements between 2001 and 2011, through which Coventry was required to sell and Lavastone was required to buy all policies fitting Lavastone's eligibility criteria.  Policies outside Lavastone's eligibility criteria could be sold to other investors.  [*See* Compendium of Life Policies Origination Agreements, attached as **Exhibit D**.]

25.   The more policies Coventry could "find" the more money it stood to make.  [*See, e.g.,* **Ex. D** (2006 Origination Agreement) at 274 (Coventry received an "origination fee" of 5% of the net death benefit for every policy it sold to Lavastone);

---

(Dir. Exam of Alan Buerger) at 390:8 – 394:7, ECF No. 203, Ritche Risk-Linked Strategies Trading (Ireland) v. Coventry First LLC, 1:09-cv-01086 (S.D.N.Y.) (attached hereto as **Exhibit B**) (testifying that himself and the Buerger Family, or trusts for their benefit, own, manage, and run numerous Coventry entities); Coventry Organizational Chart, dated Sept. 19, 2004, ECF No. 106-7 at 153-54 (attached to Decl. of Jefferson Bell (ECF No. 106 ¶ 29), Lavastone Capital LLC v. Coventry First LLC et al., No. 1:14-CV-07139-JSR (S.D.N.Y.) (attached hereto as **Exhibit C**) (showing Alan, Constance, and Reid Buerger owning, directly or through trusts for their benefit, over 20 Coventry entities, including without limitation, PFP Funding I LLC, PFP Funding II, LLC, Coventry Capital LLC, LST I LLC, LST II LLC, LST III LLC, Montgomery Capital, Inc., The Coventry Group, Inc., and Coventry Financial LLC).]

[3] Lavastone Capital LLC (formerly known as AIG Life Settlements LLC) is a Delaware limited liability company, who is an indirect subsidiary of American International Group, Inc. ("AIG").  *See* Complaint ¶ 15, *Lavastone Capital LLC v. Coventry First LLC et al.*, 1:14-cv-07139.  Various indirect subsidiaries of AIG entered into or the were the beneficiary of the Origination Agreements referred to in **Ex. D**, and, will be referred to collectively as "Lavastone."

7

*Id.* at 242, § 5.05 (Coventry earned a variable "success fee" based on Coventry's ability to acquire policies cheaply).]

### To Meet Excessive Investor Demand, Coventry Generated Policies That Would Not Otherwise Have Existed Through a Non-Recourse Premium Finance Program

26.    The problem Coventry generally encountered in maximizing its potential revenue from originating policies for itself and for institutional investors was that there simply did not exist in the market sufficient senior citizens with pre-existing policies meeting institutional investment criteria who wanted to sell those pre-existing policies to Coventry as part of a legal and regulated life settlement transaction.  *See Price Dawe*, 28 A.3d at 1070 (citing Susan L. Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 134 U. Pa. J. Bus. L. 173, 175 (2010)) (explaining that the securitization of life insurance policies "substantially increased the demand for life settlements, but did not affect the supply side, which remained constrained by a limited number of seniors who had unwanted policies of sufficiently high value.  As a result, . . . promoters sought to solve the supply problem by generating new, high value policies"); [Kelly J. Bozanic, *An Investment to Die For: From Life Insurance to Death Bonds, the Evolution and Legality of the Life Settlement Industry*, 113 Penn St. L. Rev. 240-242 (2008), attached hereto as **Exhibit E** (explaining that "supply constraints in the life settlements market give way to STOLI" and that securitization in the life settlements market creates the potential for fraud and for "circumvention of the insurable interest laws").]

27.    To solve this problem, Coventry designed the Premium Finance Plus ("PFP") Program for which Coventry served as Program Administrator as well as Servicing Agent to the nominal lender, LaSalle Bank.  *Sun Life v. U.S. Bank,* 369 F. Supp. 3d 601, 616 (D. Del. 2019) (hereinafter, "*Sol*"); *Sun Life v. U.S. Bank*, 14-62610, 2016 WL 161598, at \*7 (S.D. Fla. Jan. 13, 2016), *aff'd on all issues except prejudgment interest by* 693 Fed. Appx. 838, 840 (11th Cir. 2017) (hereinafter, "*Malkin*"); *U.S. Bank v. Sun Life*, 14- 4703, 2016 WL 8116141, at \*3 (E.D.N.Y. Aug. 8, 2016), *R&R adopted*

*by* 2017 WL 347499 (E.D.N.Y. Jan. 24, 2017) (hereinafter, "*Van de Wetering*"); *Sun Life v. Wells Fargo Bank, N.A.,* No. 17-06588, 2020 WL 1503641, at *3 (N.D. Ill. Mar. 3, 2020) (hereinafter, "*Corwell*").

28.    The PFP Program generated policies for Coventry to resell to investors through non-recourse premium finance loans (nominally from LaSalle Bank, but actually from a Coventry-related entity PFP Funding I, LLC) to fund premiums on the sorts of policies Coventry (on behalf of itself and other market investors, such as Lavastone) was looking to acquire sufficient to keep those policies in force until shortly after the expiration of a policy's standard two-year contestable period.  *Corwell*, 2020 WL 1503641 at *3, 6, 13 (explaining that although LaSalle Bank was the nominal lender, 100% of the risk on the loans was ceded to a Coventry entity known as PFP Funding I LLC and that repayment of the loan was to be made, not to LaSalle, but to PFP Funding I LLC); *Van de Wetering*, 2016 WL 8116141, at *17 (finding insured "was under no obligation to repay the loan to Coventry, which paid all the premiums and acquired the Policy"); *Malkin*, 2016 WL 161598, at *4 (finding the funder, "Coventry, dictated what documents were necessary to become part of the program and were otherwise 'non-negotiable.'"); *Sol*, 369 F. Supp. 3d at 605 (("Coventry, with the help of U.S. Bank, established and directed a program to increase the number of high-value life insurance policies available on the secondary market.")

29.    The non-recourse nature of the loans Coventry issued meant that neither borrowers nor insureds had any real obligation to re-pay the loan, which was secured solely by the life insurance policy that the loan was being used to create in the first place.  *See, e.g.*, *Sol*, 369 F.Supp.3d 601, 610 ("[T]he non-recourse nature of the loan meant that neither . . . [the insured] nor the Sub-Trust had an 'obligation to repay' [the PFP loan] sufficient to support a conclusion that Sol actually 'procured' the Policy."); *Van de Wetering*, 2016 WL 8116141, at *32 ("Mr. Van de Wetering had no obligation to repay the 'loan'. . . [and] if the Policy was not sold for a profit at the conclusion of the loan term, Mr. Van de Wetering could turn over the Policy to Coventry and walk

away."); *Malkin*, 2016 WL 161598, at *15-17 ("The Loan was non-recourse, meaning that at the end of the loan period, Malkin could relinquish the Policy to Coventry and walk away from the Loan without personal financial detriment . . . the Loan Program was. . . simply smoke and mirrors meant to obscure the identity of the party [Coventry] responsible for procuring the Policy.").

30.    The Coventry PFP loans were not designed to be repaid; they typically carried high interest rates, significant fees, and prepayment penalties; and the entire transaction was tightly controlled by Coventry using Coventry-created boilerplate documents.  *See, e.g.*, *Van de Wetering*, 2016 WL 8116141, at *17 (explaining that Coventry "dictated" the deal documents); *Sol*, 369 F.Supp.3d at 606, 615 ("Coventry (or its contracting lenders) charged high fees and interest rates on the short-term loans used to pay the policies' premiums"; in that case, an interest rate of 17.24% and fees in excess of $15,000); *see id.* at 611 (noting that insured "lacked the practical ability to repay the loan"); *Corwell*, 2020 WL 1503641 at **13-14 (explaining that the Coventry program was designed to cloak what was really going on, namely investors using an insured to create a policy the investors could not otherwise acquire—"The Process was constructed to stack the odds in favor of Coventry First ending up with the Policy and selling it to [an investor] . . . Corwell only contributed his insurability to the transaction.").

31.    Upon maturity of the loan, if Coventry (or another investor) could be persuaded to buy the policy for an amount in excess of the total amount due on the loan, the policy could be sold for a profit; otherwise, the policy could be relinquished to Coventry in complete satisfaction of the loan.  *See, e.g.*, *Malkin*, 2016 WL 161598, at *4 (policy funded by Coventry loan relinquished to Coventry); *Corwell*, 2020 WL 1503641 at *2 (policy funded by Coventry relinquished to Coventry); *Estate of Malkin v. Wells Fargo Bank*, 2019 WL 176178, at *4 (S.D. Fla. Jan. 11, 2019) (hereinafter, "*Estate of Malkin*") (policy relinquished to Coventry in satisfaction of loan); *Van de Wetering*, 2017 WL 8116141 at *7 (policy funded by Coventry loan bought by Coventry

for an amount in excess of loan amount); *Sol*, 369 F.Supp.3d at 607 (policy funded by Coventry loan bought by an investor other than Coventry for an amount in excess loan amount).  Either way, in all (or nearly all) of the thousands of policy transactions orchestrated by Coventry through its non-recourse premium finance program an investor—not the insured—ended up with the policy.

32.    Courts have consistently held that Coventry's non-recourse premium finance loans create illegal human life wagers lacking insurable interest at inception (i.e., STOLI policies) under Delaware law, which controls here.  *See, e.g.*, *Malkin*, 2016 WL 161598; *Van de Wetering,* 2016 WL 8116141; *Estate of Malkin*, 2019 WL 176178; *Sol*, 369 F. Supp. 3d 601; *see also Corwell*, 2020 WL 1503641, at *13-14 (Illinois law).

**Coventry took the PFP Loan Program to Scale Through a Nationwide Network of Insurance Brokers Like Kevin Martin**

33.    To take the PFP Program to scale and maximize its revenue, Coventry engaged a network of insurance producers to identify seniors meeting (or nearly meeting) the market's investment criteria to put through Coventry's PFP program.  *See, e.g.*, *Malkin*, 2016 WL 161598, at *3 (Coventry Producer Larry Bryan signs Producer Agreement with Coventry); *Van de Wetering*, 2016 WL 8116141, at *3 (Coventry Producer Bruce Mactas signs Producer Agreement with Coventry); *Sol*, 369 F.Supp.3d at 605 (Coventry Producer Lindsay Spalding signs Producer Agreement with Coventry); *Corwell*, 2020 WL 1503641 at *3 (Coventry Producer Frank Nelsen signs Producer Agreement with Coventry); [*see also* Coventry's Financial Services and Procedure Guide, attached hereto as **Exhibit F** at 420 ("All brokers must be contracted in order to fund premium finance ('PFP') cases with Coventry Capital.").]

34.    These insurance producers were required to sign Producer Agreements with Coventry, which required them to identify, solicit, and submit to Coventry any senior citizens meeting the relevant criteria and that prohibited these producers from saying anything about Coventry's PFP Program other than what might from time to time be expressly authorized by Coventry.  *See, e.g.*, *Malkin*, 2016 WL 161598, at *3

(Coventry Producer Larry Bryan agreeing to do these things for Coventry) (citing 14-cv-62610, Dkt. 66-5 (producer agreement)); *Van de Wetering*, 2016 WL 8116141, at *3 (Coventry Producer Bruce Mactas agreeing to do these things for Coventry); *Sol*, 369 F. Supp. 3d at 605 (Coventry Producer Lindsay Spalding agreeing to do these things for Coventry); *Corwell*, 2020 WL 1503641, at *3 (Coventry Producer Frank Nelsen agreeing to do these things for Coventry.

35.    In exchange for allowing the agent to participate in Coventry's PFP Program, Coventry required the agents to split their commissions with Coventry or a Coventry-affiliated entity.  *See, e.g., Malkin*, 2016 WL 161598, at *1 (Coventry Producer Larry Bryan required to split commissions with Coventry); *Van de Wetering*, 2016 WL 8116141, at *3 (Coventry Producer Bruce Mactas required to split commissions with Coventry); *Sol*, 369 F. Supp. 3d 601, 605 (Coventry Producer Lindsay Spalding required to split commissions with Coventry); *Corwell*, 2020 WL 1503641, at *3 (Coventry Producer Frank Nelsen required to split commissions with Coventry); [*see also* **Ex. F** at 437-439 (discussing commission splits).]

36.    The fact that Coventry was receiving half of all insurance commissions paid on the STOLI policies it created and paid for was not disclosed to the insureds on whose lives Coventry was illegally wagering, nor was this material fact (and other material facts) disclosed to the insurance carriers Coventry and its agents misled into issuing these STOLI policies.

37.    Indeed, Coventry concealed itself from the insurance carriers and did not disclose to the insureds the true illegal nature of its PFP Program and STOLI scheme. The reason for this was obvious:  Coventry and its agents knew full well that the scheme they were running was in violation of applicable law and that if uncovered by the insurance carriers from whom Coventry was seeking insurance coverage on the lives of strangers, those carriers would not issue these policies in the first place and Coventry would be unable to maximize its revenue by "originating" policies on the lives of strangers.

38.    In this way, like other STOLI operators, Coventry created and ran a program designed to at most "feign technical compliance" with insurable interest laws, and which in reality generate illegal and void *ab initio* human life wagering contracts. *C.f., Price Dawe*, 28 A.3d at 1074 ("Indeed, the STOLI schemes are created to feign technical compliance with insurable interest statutes.").

39.    Between 2001 and 2011, Coventry originated over 9,000 policies with an aggregate face amount of over $25 billion.  [*See* Coventry Summary of Life Settlement Margins, attached as **Exhibit G** at 447.]

**IN OR AROUND 2006, COVENTRY—WHO DID NOT HAVE AN INSURABLE INTEREST IN MR. DAHER—PROCURED THE POLICY ON HIS LIFE**

40.    In 2006, Mr. Daher was an 80-year-old citizen of Los Angeles County, California who did not need a multi-million-dollar life insurance policy.

41.    On information and belief, in or around 2006, Coventry—not Mr. Daher—procured the Policy on Mr. Daher's life as a gamble for investors.

42.    Coventry dictated every aspect of the Policy's creation and provided a set of boilerplate forms—the same used in hundreds (if not thousands) of other cases.

43.    To facilitate this transaction, Coventry directed the creation of the Joseph Daher Insurance Trust, dated March 20, 2006 (the "Insurance Trust"), a sham Delaware statutory trust created in Delaware, executed in Delaware, and governed by Delaware law. [*See* Trust Agreement, a copy of which was produced by Wilmington Trust, attached as **Exhibit H** ¶ 3 ("It is the intention of the parties that the Trust constitute a statutory trust under Section 3801 et seq. of Title 12 of the Delaware Code (the "Act"), and that this document constitute the governing instrument of the Trust.  The Trustee is hereby authorized and directed to execute and file a certificate of trust with the Delaware Secretary of State.").]

44.    Coventry directed the use of its boilerplate trust agreement used in hundreds (if not thousands) of other cases.

45.     As it did in all or nearly all of its Delaware cases, Coventry installed Wilmington Trust Company ("Wilmington Trust"), whose principal place of business is in Wilmington, Delaware, as the Insurance Trust's trustee, *see id.* at ¶ 10, and used the Insurance Trust as a cover to procure the Policy without a valid insurable interest.

46.     The Insurance Trust, created and funded by Coventry, was a sham trust created as a cover for a wager on Mr. Albart's Life. [*See, e.g., id.* at ¶ 2 (providing for nominal funding of $1.00).]

47.     Wilmington Trust, as trustee of the Insurance Trust, executed a certificate of trust in Delaware and, on March 20, 2006, filed a certificate with the Delaware Secretary of State.  [*See* Delaware Certificate of Trust, a copy of which was produced by Wilmington Trust, attached hereto as **Exhibit I**.]

48.     The sole purpose of the Insurance Trust (a Delaware trust) was to hold bare legal title to a life insurance policy that Coventry planned to acquire; indeed, the Insurance Trust was created on March 20, 2006 (the day before the Application was signed).

49.     Coventry did not intend to have Mr. Daher pay the premiums on the Policy, nor did Mr. Daher intend to pay the premiums on the Policy; instead, at Coventry's direction (and on Coventry's boilerplate form used in hundreds—if not thousands—of other cases) Wilmington Trust, as trustee, created a series trust of the Insurance Trust (the "Sub-Trust"), to take out a nonrecourse premium finance loan paid for and administered by Coventry.  [*See* Supplement to Trust Agreement, attached as **Exhibit J**.]

50.     The nonrecourse loan was set forth in a Note and Security Agreement, on Coventry's boilerplate form (the same form used in hundreds—if not thousands—of cases) funded by Coventry, pledging the assets of the Insurance Trust (i.e., the Policy) as the sole collateral and permitting satisfaction of the loan by relinquishment of the Policy.  [*See* Note and Security Agreement, attached as **Exhibit K** at 486 (explaining "[t]he Loan is non-recourse, meaning that nothing else secures your obligations to us

and that we will not seek to collect the amounts due hereunder other than from the proceeds of such Collateral").]

51.     The nonrecourse loan was between the Sub-Trust as borrower, signed by Wilmington Trust, and LaSalle Bank National Association, as nominal lender, signed for by Coventry executive Krista Lake as attorney in fact for LaSalle.  [*Id.* at 8].  Mr. Daher was not the borrower and had no personal obligation on the loan.

52.     On information and belief, neither Mr. Daher (nor anyone else with an insurable interest in his life) paid any of the premiums on the Policy.

53.     Upon information and belief, the real lender was Coventry because, as U.S. District Court Judge Reinhard recently explained in a publicly-filed opinion declaring a similar Coventry-originated policy on a nearly identical Coventry loan to be an illegal cover for a wager under Illinois law:

> Coventry Capital and LaSalle Bank established a program through which prospective purchasers of life insurance could finance the premiums to acquire life insurance policies from insurers.  They did so by entering an agreement under which Coventry Capital served as the program administrator for a premium finance loan program through which LaSalle made loans to finance the payment of life insurance policy premiums.  LaSalle then entered another agreement, a Master Participation Agreement, with PFP Funding I, LLC ("PFP Funding").  Under the Master Participation Agreement, PFP Funding purchased from LaSalle a '100% undivided beneficial ownership interest' in premium finance loans LaSalle had made.  This made PFP Funding the beneficial owner of the premium finance loans Coventry Capital was servicing for LaSalle.  PFP Funding, Coventry First, and Coventry Capital (collectively 'Coventry Entities') had a common ownership.
>
> ***
>
> Coventry Capital, therefore, was administering the program ultimately for the benefit of another of the Coventry Entities.

*Corwell*, 2020 WL 1503641, at *3,13.

**COMPLAINT**

54.     At Coventry's direction, the Policy was applied for by the Insurance Trust as owner, listing the owner's address in Wilmington, Delaware.  [*See* Policy at 33 (personal information redacted), attached hereto as **Exhibit L**.]

55.     The Insurance Trust, as proposed owner, signed the Application through its trustee, Wilmington Trust, in Wilmington, Delaware.  [*See id.* at 35.]

56.     The application lists the beneficiary to be the Insurance Trust.  [*Id.* at 33.]

57.     On or about February 25 2006, American General issued the Policy, a Delaware life insurance policy, stating: "THIS IS A DELAWARE CONTRACT."  [*Id.* at 3 (capitals in original).]

58.     Upon information and belief, the Policy was delivered or issued for delivery to the Insurance Trust, as owner, at the address of its Delaware trustee, in Delaware.

59.     Coventry chose to have the Policy initially issued to the sham Insurance Trust, in part, as a vehicle to conceal the use of non-recourse premium financing from the carrier as part of Coventry's overall STOLI scheme.

60.     The non-recourse loan used to finance the Policy had a 30-month term, placing its expiration approximately 6 months past the contestable period, "due" on September 30, 2008.  [*See* **Ex. K** (Note and Security Agreement) at 492.]

61.     Upon information and belief, Wilmington Trust, as trustee of the Insurance Trust, purportedly "repaid" the nonrecourse "loan" by purportedly relinquishing the Policy to QL Investment Trust Alpha Series [13] (the "QL Trust"), a series of a Delaware series trust.  The QL Trust has (or had) an address in Los Angeles, California.

62.     The QL Trust purportedly acquired equitable ownership of the Policy through a Life Insurance Policies Purchase Agreement, dated September 29, 2008, purportedly executed by the Insurance Trust in Delaware and by the QL Trust in Los Angeles, California.  [*See* Life Insurance Policies Purchase Agreement, attached as **Exhibit M** at 568.]

**COMPLAINT**

63.     The QL Trust is (or was) an investment trust owned by Quantlife LLC ("Quantlife"), a Delaware limited liability company, which is (or was) in turn a wholly owned subsidiary of the H.M. Ruby Fund L.P., a Delaware limited partnership engaged in the life settlement business.  The QL Trust, Quantlife and H.M Ruby, at all times relevant to this Complaint, maintained their principal place of business in Los Angeles, California.

64.     The QL Trust subsequently transferred nominal title to Wells Fargo Bank, N.A. as securities intermediary, so that Wells Fargo could serve as record owner with the insurer.

65.     On January 28, 2010, Wells Fargo, through Assistant Vice President Brent Oliver, submitted a change of ownership request to American General, to list Wells Fargo Bank, N.A., as Securities Intermediary, to be the new purported record "owner" of the Policy.

66.     Wells Fargo, solely in its capacity as securities intermediary, is a common bank used by STOLI investors to serve as record owner of STOLI policies so that, when they invariably sell and resell the policies, the investors' identities need not be disclosed to the insurance carriers and no change of ownership is needed at the carrier level.  [*See, e.g.,* Dep. Brent Oliver (corporate designee for Wells Fargo Bank, N.A. as Securities Intermediary), *Lincoln Nat'l Life Ins. Co. v. Sprei et al.*, 1:16-cv-05171-PKC-RML (E.D.N.Y) ("*Sprei*"), Doc. 120-4, attached as **Exhibit N** at 14:11-15:25.][4]

67.     Although the Policy was thereafter continually listed as being owned by Wells Fargo as securities intermediary, equitable ownership changed hands multiple times in the market between 2010 and 2011, before being purportedly acquired by FCOF LS LLC, part of a family of Delaware companies known as Fortress.

---

[4] LSH intervened and cross-claimed in *Sprei*.

## LSH KNOWINGLY PURCHASES A STOLI POLICY

68.     AIMCo is an investment firm based in Alberta, Canada, which has acquired over $3 billion in life insurance policies on senior citizens' lives through a subset of its global equity portfolio known as its Life Settlement Holdings Pool.

69.     AIMCo has been investing in life insurance policies since 2010, having established LSH to hold the policies.  [*See* Report of the Auditor General of Alberta, Oct. 2014, Treasury Board and Finance, attached as **Exhibit O** at 597.]

70.     LSH's sole purpose is to hold investments in life insurance policies primarily (if not exclusively) on the lives of seniors citizens.  [*See, e.g.,* LSH CO Financial Statements and Report of the Réviseur d'Enterprises Angréé, year ending Dec. 31, 2018, attached as **Exhibit P** at 644 (showing 84% of insureds in LSH's portfolio were calculated to pass away within 6 years.]

71.     LSH has established itself as a major participant in the investor market for life insurance.  At the close of 2011, LSH reported owning 383 life insurance policies, with a total face value of $1.8 billion.  [*See* LSH CO S.A. Annual Report of the Board of Directors, dated June 2013, attached hereto as **Exhibit Q** at 672.]  By the close of 2012, the same year LSH purportedly acquired the Policy, LSH reported owning 552 policies, with a total face value of $3 billion.  [*Id.*]  At the close of 2018, LSH reported owning 436 policies with a total face value of $2.28 billion.  [**Ex. P** at 644.]

72.     LSH acquired most (if not all) of its policies pursuant to an origination agreement, amended from time to time, (the "Origination Agreement") with a family of companies that is (or was at all times relevant to this Complaint) based in Naples Florida, known as CMG.  [*See* Am. Rest. Origination Agreement, attached as **Exhibit R**.]

73.     Under the Origination Agreement, beginning in 2010, LSH hired CMG (including CMG Surety LLC and CMG Life Services, Inc., each of which have or had at all times relevant to this Complaint their principal place of business in Florida) to buy policies on its behalf for resale to LSH.  If policies fit defined eligibility criteria, LSH

provided funding to CMG to purchase the Policy or was otherwise required to buy them from CMG immediately after acquisition.

74.     CMG also agreed to perform various different services for the acquisition and ongoing maintenance of policies, including without limitation conducting diligence at the acquisition phase for LSH, monitoring legal trends, and monitoring the insureds on whose lives LSH owned policies.

75.     CMG received an ownership interest in LSH.  [*See* **Ex. Q** (LSH Financials 2012) ("CMG Surety LLC is a shareholder of [LSH] and is considered a related party.")]

76.     LSH also "aligned its interest with CMG's," as LSH has explained: [LSH] has aligned its interest with [CMG's] interests through a structuring arrangement and contractual obligation to participate in [LSH]'s equity and future performance. . . . [LSH's] Board of Directors believes this alignment of interest between [LSH] and [CMG] is critical to insuring the future performance of the portfolio."  [*See* LSH CO, S.A. Financial Statements, year ending 31 Dec. 2011, attached as **Exhibit S** at 775.]

77.     On or about January 27, 2012, CMG Life Services, Inc. ("CMG Life Services"), from its offices in Naples Florida, purportedly acquired all rights and interests in a series of policies, including the Policy, from FCOF LS LLC.  CMG bought the series of policies (including the Policy) on behalf of LSH, with LSH's funds, so the series of policies (including the Policy) could be resold immediately to LSH.

78.     Pursuant to the Origination Agreement, CMG transferred, assigned, or otherwise sold the Policy to  LSH a few weeks later on or about February 14, 2012.

79.     Prior to LSH's formal acquisition, CMG analyzed the Policy (including for the presence of insurable interest at inception) on LSH's behalf from its offices in Naples, Florida.

80.     Pursuant to securities intermediary agreements between Wells Fargo and Fortress/FCOF LS LLC, Wells Fargo and CMG, and Wells Fargo and LSH, Wells Fargo remained record owner with American General through all the purported changes in equitable ownership.

81.     When LSH acquired a purported beneficial interest in the Policy, it was aware that the insured (Mr. Daher) was a California resident and LSH intended to make money (i.e., collect the death benefit) when he died.

82.     When LSH acquired a purported beneficial interest in the Policy in 2012, LSH intended (either directly or through its agents) to keep regular contact with Mr. Daher and/or his family members in the State of California for the purposes of monitoring his health and his whereabouts.

83.     When LSH acquired a purported beneficial interest in the Policy, it knew or willfully blinded itself to the fact that the Policy was issued without insurable interest as part of a known phenomenon in the mid-2000s for high face value policies to be manufactured through the use of non-recourse premium financing as a tool to meet the investor demand that could not be satisfied by the existing pool of legitimately procured policies.  LSH has conceded in other litigation that it was aware of the prevalent use of premium financing during this time period.  [*See, e.g.,* LSH's First Am. Complaint, *LSH CO et al. v. AXA*, 1:18-cv-02111 (S.D.N.Y.), attached as **Exhibit T**, ¶ 14 ("Premium financing was an industry-standard practice that was very popular from 2003 until the financial crisis in 2009 . . . using the policy as the primary collateral for the loan. . . with very little personal liability or risk during the loan term").]

84.     LSH (and its agents) knew that all or nearly all of the policies it bought from FCOF LS LLC/Fortress in 2012 had utilized non-recourse premium finance loans. In addition to the transaction through which LSH acquired the Policy, LSH acquired a larger portfolio of policies through several transactions with FCOF LS LLC (or other Fortress-related entities) in 2012.

85.     In particular, LSH, when it acquired a purported beneficial interest in the Policy, was aware that the Policy was manufactured for investors through non-recourse premium financing, in particular, one of Coventry's non-recourse premium finance programs, including the PFP program.

**COMPLAINT**

86.     LSH (along with its parent, AIMCo and its policy originator CMG) knew or should have known when LSH purportedly bought the Policy, that the Coventry program systematically created policies that were illegal under the laws of numerous states, including Delaware.

87.     When LSH bought the purported interest in the Policy, LSH (along with its parent AIMCo, and its policy originator, CMG) knew or should have known that Coventry acquired, prior to the Policy's issuance, life expectancy reports on Mr. Daher, to evaluate the advisability of investing in his mortality.

88.     When LSH bought the purported interest in the Policy, LSH (along with its parent, AIMCo and its policy originator, CMG) knew or should have known that the broker (Kevin Martin) had signed an agreement to provide, and did in fact provide, part of the commissions he received from the carrier related to the issuance of the Policy, an agreement which was not disclosed to the carrier or to Mr. Daher.

89.     When LSH acquired the purported interest in the Policy, LSH (along with its parent, AIMCo, and its policy originator, CMG) knew that the Policy had been funded with a non-recourse premium finance loan that carried high fees and interest rates—here, an interest rate of 16.59% and an all-in rate of 18.29%.  [*See* **Ex. K** (Note and Security Agreement) at 492.]

90.     When LSH acquired its purported interest in the Policy, it knew or should have known that the insured (Mr. Daher) did not pay the premiums on the Policy and that the Insurance Trust was created by Coventry as part of a STOLI scheme and funded with no more than a nominal $1.

91.     When LSH acquired the purported interest in the Policy, LSH (along with its parent, AIMCo, and its policy originator, CMG) knew or should have known that Mr. Daher never really owned the Policy or its beneficial interest, and that Mr. Daher never had any personal obligation on the Coventry nonrecourse loan.  Rather, LSH knew or should have known that Coventry paid for and procured the Policy and used Mr. Daher as an instrumentality to advance its STOLI scheme.

92.     When LSH acquired the purported interest in the Policy, LSH (along with its parent, AIMCo, and its policy originator, CMG) knew or should have known that Coventry had been the subject of public litigation for years, including without limitation, public investigations by the New York Attorney General's Office and the Florida Office of Insurance Regulation.

93.     When LSH acquired the Policy, LSH (along with its parent, AIMCo, and its policy originator, CMG) knew or should have known of the decision in *Pruco Life Ins. Co. v. Brasner*, 2011 WL 13117063, at *8-9 (S.D. Fla. Nov. 14, 2011), which identified the Coventry program (which originated the Policy) as creating illegal STOLI policies.[5]

94.     When LSH acquired the purported interest in the Policy, it did so as the successor in interest to Coventry, which through various Coventry entities procured the Policy without insurable interest, and as the successor in interest to the Insurance Trust, to which the Policy was purportedly initially issued as owner.

95.     LSH therefore acquired no greater rights than either Coventry or the Insurance Trust (or any of the other interceding assignees) had in the Policy.  LSH stands in the shoes of Coventry in terms of its knowledge, participation, and funding of the STOLI scheme, through which the Policy was procured as a human life wager.

96.     When LSH acquired its purported interest in the Policy, it was aware that the Policy was a Delaware insurance policy, which had been issued to a Delaware insurance trust (the Insurance Trust) as owner, with a Delaware trustee (Wilmington Trust), originated by a Delaware family of companies (Coventry).

---

[5] The decision was reversed because the Florida Supreme Court subsequently held that for a Florida policy, unlike in Delaware, STOLI policies did not violate Florida's then-existing insurable interest laws.  *Wells Fargo Bank, N.A. v. Pruco Life Ins. Co.*, 200 So. 3d 1202, 1206 (Fla. 2016).  This happened well after LSH elected to buy the Policy. Although the *Brasner* case's holding was ultimately overturned as a matter of Florida law, in the intervening years, Coventry-procured policies have been consistently held to lack insurable interest under Delaware law.  *See, e.g., Malkin*, 2016 WL 161598; *Van de Wetering*, 2016 WL 8116141; *Estate of Malkin*, 2019 WL 176178; *Sol*, 369 F. Supp. 3d 601.  LSH knew or should have known of these opinions and yet LSH continued to pay premium on the Policy and otherwise perpetuate this illegal human life wager in Delaware.  The Policy is governed by Delaware law.

**COMPLAINT**

97.     When LSH acquired its purported interest in the Policy, LSH (either individually or through its agents) knew or should have known of the Delaware Supreme Court's decision in *Price Dawe*, which had been issued four months earlier, and thus knew or should have known that the Policy would be subject to legal challenge under Delaware's constitutional and public policy prohibitions on gambling, as well as Delaware's insurable interest laws.  Additionally, because the decision had come from the highest court in Delaware, LSH and/or its agents knew or should have known there was an increased likelihood that Delaware policies in general, but especially Delaware trust-owned policies (such as the Policy) would be challenged.

98.     When LSH acquired its purported interest in the Policy, it knew or should have known that the Policy was created by Coventry for investors (rather than for a legitimate life insurance need) and therefore lacked insurable interest.   LSH nevertheless knowingly purchased the Policy because LSH believed it would not get caught and that any litigation loss would be substantially (or entirely) offset by the profits it would make on other policies purchased at a steep discount.

99.     LSH also believed that any litigation risk that either the Policy in particular, or the portfolio of policies LSH purchased in 2012 from FCOF LS LLC might be challenged would be substantially outweighed by LSH's belief that most of the policies in the portfolio would never be challenged and that even if a few policies were ultimately challenged successfully, the courts in in those instances could be persuaded to return their premiums.  In other words, LSH believed that investing in illegal Delaware human life wagers could be massively profitable even if they got caught a few times.

**LSH Continued to Pay Premiums and Requested the Death Benefit on a Coventry STOLI Policy Even As Courts Around the Country Strike Down Nearly Identical Policies Created on Identical Coventry Forms**

100.    Since acquiring the Policy, LSH paid ongoing premiums on the Policy to American General, through either or both of LSH's policy payment agent, Mills

Potoczak (who did so from their offices in Cleveland, Ohio), as well as Wells Fargo (who did so from its offices in Salt Lake City, Utah or Minneapolis, Minnesota).

101.   The decisions of when and how much premium to pay were determined in consultation with CMG (from its offices in Naples Florida) and, as of 2017, through consultation with Preston Ventures (from its office in Aliso Viejo, California).

102.   LSH, through its agents CMG, Mills Potoczak (and later Preston Ventures), re-evaluated Mr. Daher's mortality (i.e., how quickly he would die) as part of a periodic evaluation of the Policy's value, and whether to continue paying premiums or letting the Policy lapse.

103.   LSH, through one or more of its agents (including Mills Potoczak) established regular and periodic communications with Mr. Daher and/or his family members in California, including by email, at least four times a year beginning in 2012, asking for quarterly updates on Mr. Daher's health status, his contact information, and his whereabouts.   This was part of LSH's ongoing effort to monitor Mr. Daher's mortality.

104.   On December 8, 2017, Mr. Daher passed away in Los Angeles County, California.

105.   Following Mr. Daher's death, LSH, through one or more of its agents (including Preston Ventures LLC from its offices in Orange County, California), requested and received a death certificate from Los Angeles County, California, for the purposes of including it in a request for the death benefit from American General.

106.   Following Mr. Daher's death, LSH (through one or more of its agents) directed Wells Fargo to submit (and Wells Fargo did in fact submit) Mr. Daher's Los Angeles County death certificate to American General and requested that American General pay Wells Fargo at least $5 million.

107.   Preston Ventures (from Orange County, California) assisted with the request for the death benefit.

108.   On behalf of LSH, Wells Fargo received the death benefit in or about February 2018, and shortly thereafter credited the money to LSH's security account with Wells Fargo, where LSH formally received the death benefit accruing under the Policy.

109.   While LSH owned the Policy and elected to continue paying premiums, every court that looked at the Coventry program (the same one used to originate the Policy) concluded it was designed to create life insurance policies by investors for investors. *See, e.g.*, *Malkin*, 2016 WL 161598, at *17 (finding Coventry-originated policy was a "wagering instrument" and that the Coventry loan was "simply smoke and mirrors meant to obscure the identity of the party responsible for procuring the Policy"); *Van de Wetering*, 2016 WL 8116141, at *18 (finding "Coventry improperly used Mr. Van de Wetering as a conduit to acquire a policy that it could not otherwise acquire").

110.   In particular, LSH knew that, prior to submitting the death benefit (and continuing to pay premium), two different federal courts issued lengthy opinions explaining why the Coventry nonrecourse premium financing program (the same or substantially similar program used to originate the Policy) produced illegal policies that were nothing more than a cover for human-life wagers under Delaware law, which controls here. *See, e.g., Malkin*, 2016 WL 161598; *Van de Wetering*, 2016 WL 8116141.

111.   Prior to submitting the death benefit (and continuing to pay significant premium), LSH (along with its parent, AIMCo, its policy originator, CMG, and its policy monitoring agent, Preston Ventures) knew or should have known of numerous articles in the Life Settlements Report, a widely circulated publication, discussing the decisions in *Malkin* and *Van de Wetering* and questioning the value of Coventry originated policies in light of the obvious litigation risk. [*See, e.g.,* Compendium of Life Settlements Reports, attached as **Exhibit U**]

112.   Prior to submitting the death benefit, and continuing to pay significant premium, LSH (including through its agents and its advisors) knew that Fortress, the

entity that purportedly sold the Policy to CMG (with LSH's approval and with LSH's funds) warned its own investors prior to that time that its own portfolio carried significant legal risk, including because most of the policies in its portfolio used premium financing and consisted of "groupings of policies that were originated in the same or similar manner." [*See* Asset-Backed Securities Memorandum dated August 12, 2011, attached as **Exhibit V** at 884 (available at https://www.ise.ie/debt_documents/ListingParticulars_501e5b69-c72e-41cb-8ac7-9e0338e5653e.PDF (last accessed April 9, 2021); *see also* Fortress Told Investors Its Portfolio Could Contain STOLI, The Deal, Nov. 19, 2013, attached as **Exhibit W**.]

113.   LSH has purportedly owned and does own numerous insurance policies issued on the lives of California residents, including the Policy, even though, on information and belief, many of those policies lacked insurable interest and were procured as human-life wagers.

114.   On information and belief, beginning in 2017, some or all of the decisions regarding when and how much premium to pay on the Policy were made by LSH's agent, Preston Ventures LLC ("Preston"), from their offices in California.  *See* **Ex. P** at 611 (showing installment of Preston as Life Settlements Provider and Policy Monitoring Agent).  Since 2017, Preston (from its offices in Orange County, California) has been advising LSH on various aspects of its portfolio of life insurance policies, and, in that capacity, Preston  has had (and continues to have) significant influence over LSH.

115.   LSH and Wells Fargo elected to initiate litigation in this District against an insurance carrier.  In that suit LSH and Wells Fargo allege they can properly pursue damages suffered by prior policy owners because, LSH and Wells Fargo allege, they stand in the shoes of their predecessors.  [*See* Complaint, D.I. 1, *LSH CO, LSH II CO, and Wells Fargo Bank, N.A. v. Transamerica Life Ins. Co.*, 2:18-cv-09711-CAS-KS, attached as **Exhibit X** ¶ 13.]

116.   On information and belief, in or around February of 2018, American General paid the Policy's death benefit to Wells Fargo Bank, N.A., as securities intermediary, who transferred, credited, or otherwise assigned some or all of the funds to LSH CO or LSH II CO (to whom LSH CO has succeeded in interest).

## FIRST CAUSE OF ACTION: RECOVERY OF INSURANCE PROCEEDS DUE TO LACK OF INSURABLE INTEREST

117.   The Estate hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

118.   The Policy is controlled by and subject to Delaware law, and specifically Delaware's Insurable Interest statute, 18 *Del. C.* § 2704, because it is a life insurance policy that was delivered or issued for delivery in Delaware.  *See,* 18 *Del. C.* § 2701(2) (providing for the application of the subchapter of Delaware's Insurance Code that includes its statutory insurable interest requirement—§ 2704—to "all insurance contracts . . . other than . . . Policies or contracts not issued for delivery in [Delaware] nor delivered in [Delaware]").

119.   The Policy is likewise controlled by and subject to Delaware law, and specifically Delaware's Insurable Interest Statute, 18 *Del. C.* § 2704, because the Policy is a "trust-owned" policy as defined in Section 2704(e)(4) of the Delaware Insurance Code.  This is so because the Policy was issued for delivery in Delaware to a trust established under the laws of the Delaware, [*see* **Ex. H (**Trust Agreement)] and having a trustee (Wilmington Trust) with its principal place of business in Delaware.  18 *Del. C.* § 2704(e)(4).  Consequently, Section 2704(g) of the Delaware Insurance Code explicitly applies Delaware's insurable interest requirement to Delaware "trust-owned" policies regardless of where an insured resided.  *See* 18 *Del. C.* § 2704(g) ("The existence of an insurable interest with respect to a[] . . . trust-owned life insurance policy shall be governed by this section without regard to an insured's state of residency or location.").

120.   California law does not apply because, among other things, the Policy was not delivered or issued for delivery in California.  *See, e.g.*, Cal. Ins. Code § 10113.5 (applying various mandatory insurance provisions to policies "delivered or issued for delivery in [California]").

121.   The Delaware Insurance Code provides, among other things, that "no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his or her personal representatives or to a person having, at the time when such contract was made, an insurable interest in the individual insured."  18 *Del. C*. § 2704.

122.   The Delaware Supreme Court has clarified that this insurable interest requirement is not satisfied where a third party without an insurable interest uses an insured as an instrumentality to procure a policy for itself as a wager on the insured's life. *Price Dawe*, 28 A.3d 1059.

123.   Where an insurance company pays the death benefit on a policy lacking insurable interest, the "executor or administrator" of the insured is entitled to recover such benefits from the beneficiary, assignee, or payee that received the benefits as a matter of common law and statute.  18 *Del. C*. § 2704 (b).  *See, e.g., Estate of Malkin*, 379 F. Supp. 3d 1263.

124.   Upon information and belief, the Policy at issue in this case was procured without insurable interest as a wager on Mr. Daher's life.

125.   Upon information and belief, the Policy's death benefit was paid to Wells Fargo Bank, N.A., as securities intermediary, who transferred, credited, or otherwise assigned the funds to LSH CO or LSH II CO (to whom LSH CO has succeeded in interest).

126.   As a consequence, the Estate is entitled to recover those death benefits (plus applicable interest, attorneys' fees, and other costs and damages) from or through LSH and or Wells Fargo.

## SECOND CAUSE OF ACTION:  IN THE ALTERNATIVE, UNJUST ENRICHMENT

127.   The Estate hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length, and sets forth this cause of action in the alternative to the Estate's preceding claim.

128.   LSH's and/or Wells Fargo's acceptance and retention of the Policy's death benefit has enriched LSH and/or Wells Fargo, to the detriment of the Estate.  Given the circumstances surrounding the procurement of the Policy, allowing LSH and/or Wells Fargo, to retain the proceeds of the Policy is inequitable and without justification including because, among other things, the Policy was procured without insurable interest to wager on Mr. Daher's life, in violation of applicable law and public policy.

129.   Accordingly, the Estate is entitled to an award of the Policy's entire death benefit (plus applicable interest, attorneys' fees, and other costs and damages) from LSH and or Wells Fargo.

Dated:  April 14, 2021                    COZEN O'CONNOR


                                          By: /s/ *Andrew M. Hutchison*

                                          Andrew M. Hutchison  (SBN 289315)
                                          COZEN O'CONNOR
                                          101 Montgomery Street., Suite 1400
                                          San Francisco, CA 94104
                                          Tel: (415) 644-0914
                                          Fax: (415) 644-0978
                                          Email: ahutchison@cozen.com

**COMPLAINT**

1

2

*Attorneys for Plaintiff*
Estate of Joseph H. Daher

3

**DEMAND FOR JURY TRIAL**

4

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury

5

on all issues so triable.

6

7

Dated:  April 14, 2021

COZEN O'CONNOR

8

9

By: /s/ *Andrew M. Hutchison*

10

Andrew M. Hutchison  (SBN 289315)
COZEN O'CONNOR

11

101 Montgomery Street., Suite 1400
San Francisco, CA 94104
Tel: (415) 644-0914

12

Fax: (415) 644-0978
Email: ahutchison@cozen.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**